## Case No. 15,881.

UNITED STATES ex rel. AMES v. NINE HUNDRED AND FIVE PACKAGES OF TOBACCO et al.

[10 Int. Rev. Rec. 124.]

District Court, E. D. Missouri. June 10, 1869.

FRAUDS AGAINST INTERNAL REVENUE LAWS—FALSE RETURNS—TOBACCO TAX.

The 905 packages are claimed by D. M. B. Brown, who also claims 172 of the 272 caddies. The remaining 100 caddies are claimed by Gen. E. B. Brown. The value of the tobacco and machinery involved in the case is estimated at about $15,000. W. H. Powell, the inspector whose name has been frequently mentioned in the progress of the case as having attempted to defraud the government, is in Canada. where, it is stated, he fled from justice. The factory of M. B. Brown was burned after its seizure by the United States marshal. but the origin of the fire has remained unknown.

Gen. Noble and Gen. Chester, for the United States.

Mr. Harding and H. B. Lightheuser, for claimants.

The evidence in the case having been all adduced, Mr. Lightheuser addressed the jury for the claimants, and argued that they had no connection with Powell. Mr. Dietrich had come upon the stand and showed that there was a nice little arrangement between himself and Powell by which he (Dietrich) was to make a clear profit of one half the taxes on the tobacco he manufactured. Mr. Dietrich was afraid he would be discovered, and he states he was sent by Powell to Mr. Brown to get some instructions as to keeping his books; but Mr. Brown told him that he kept no sales book and that he entered his sales in a day book. Dietrich's testimony did not establish anything against Mr. Brown. The latter did not tell him that he was keeping his books with a fraudulent intent. The evidence of this witness only went to show that Mr. Dietrich went to Brown and disclosed to him his fraudulent intent, and Mr. Brown said nothing. Dietrich had testified that Brown's instructions were to show to the inspector heads of caddies which had been inspected, for reinspection. Where the tobacco which had been in caddies was damaged tobacco, and was being remanufactured, it was very proper that the old inspection should be presented to the inspector that they might not be charged twice for one inspection. But what was their conduct with respect to these caddy heads thus taken from this damaged tobacco? As had been shown by the head pressman, it was their universal habit to burn them up. He referred to the demeanor of Dietrich while on the stand, and argued from it that his testimony was not to be believed; for while he pretended to remember conversations had over a year ago, he could not say a word of a conversation had not three weeks since. Everything showed that his story was a fabrication, plainly and palpably false on the face of it. That part between the witness himself and Powell was. he thought, true. He thought his anxiety about his own suits has made him over-zealous in his efforts for the government in this case. He contended that no jury should disbelieve the evidence of Dietrich so far as it relates to Mr. Brown. Powell and Brown undoubtedly had a conspiracy; if they had not, the latter would not have turned state's evidence. He hoped the government would let Mr. Dietrich off, as the servant was worthy of his hire, and he had come up nobly for them. It seemed to him it would take an immense sight of money to make a man come up in a court of justice, and acknowledge his guilt, as Dietrich had done; no man would do it voluntarily; it must be involuntarily. He did not know whether the district attorney intended to accuse them of having committed murder, or of having burned the factory. What motives could they possibly have for doing so? They had no interest in the destruction of the factory, but every interest in its preservation; and now that it has been destroyed, the government and its officials are anxious to bring about a conviction or a forfeiture, as they know the claimants will have to have restitution of this property, if a verdict is rendered in their favor. He asked the jury to give such a verdict.

Gen. Harding followed with an address in behalf of the claimants. In the course of his remarks he said it would have been the height of folly for a merchant of Mr. B. Brown's standing to have done what he was charged with, in any effort to defraud the government of its taxes. He would have been the veriest fool in St. Louis. The district attorney had said that two serious blows had been struck at the government: one was the burning of the factory and the other the murder of a man by the name of Christian. He (Gen. Noble) had taken pains enough to say that he did not charge this claimant, not even by insinuation, with having anything to do with these matters, and he, the speaker, conceived all through the case why it was that he was eternally bringing them up, and making it necessary for them to show that Mr. Brown was absent in New York, and had been in Washington city before, when the factory was burned; making it necessary to show that with all that property there, he had but one policy of insurance upon it, and that but for $3,000, while there were 905 caddies of tobacco, worth nearly $10,000, besides the machinery in it. The attempt to connect Mr. B. Brown with Powell had utterly failed. Mr. M. Matteson, formerly governor of Illinois, went on Mr. Brown's bond, and it was signed at Gen. Brown's office as the most convenient for him, he having then been but a short time in the city.

Gen. Noble put an interrogatory—Did he wish to know what "Governor" Matteson is now doing? Dealing in whisky in New Orleans.

Gen. Harding continued. It had been stated that Powell had pursued an extraordinary course—inspecting tobacco and returning only 1/5 as inspected, then dividing 4/5 with his accomplices. But there was no evidence to this effect upon which he would hang a dog. Supposing there were, the attempt to connect the claimant with it had signally failed. Mr. Harding then compared the returns and accounts, and stated there was a considerable discrepancy in the exhibit of Mr. Ames. If their books had not been destroyed their accounts would have been seen to have been all correct.

Gen. Noble addressed the jury for the government. He commenced by adverting to the necessity which exists of the law being stringently enforced, to prevent fraud and protect the honest manufacturer and dealer. Who is the man entitled to the protection of law, he asked? Is it the thief, who is evading by every means in his power the payment, not only of the tax on the tobacco which he reports, but on that which he does not report? Or is it the man who pays the tax into the treasury from the money he receives from the consumer, and, if necessary, goes and puts his paper, with his friend's name to it, in the bank and pays whatever is required by law? The internal revenue law is just one of those laws that if a man is a friend of his country he will endeavor to see enforced strictly, constantly, unremittingly, and bring to justice those who do not observe it. He will endeavor to bring such a case as this before the bar, and have it investigated by the people, instead of it being compromised and so have no investigation at all. Let the law, the guardian law of our country, have its due operation, and every man will bear an equal burden. We ought all to rejoice that a case like this has not been compromised, and that it has been brought to a trial. There are some ideas, some principles connected with this case, that involve not only the relationship of the mercantile classes, but enter our homes, say who shall prosper, whose family shall be provided for, whose bills of credit shall be met, who shall be protected by the virtue and the bright confidences of justice, and who shall suffer. If suffering there be, it is far better that the man who cheats, who attempts to defraud, should be deprived of his property by the justice which we all admire, while honest men who attempt to compete with him in the market, like Mr. Rucker, who testified that he has had to abandon his business after 44 years of labor, are compelled to close their factories. He did not know how tobacco was manufactured so cheap then; because there was an ingredient in it; he did not choose to deal in fraud. He would not make a false oath; he said he was an old man, and had lived too long in this country to cheat the government. So honest manufacturers have fallen off by the hundred, like the leaves of a tree whose roots have been poisoned. While there is a resemblance of honesty in this fraud there is death to the revenue in it and any one who comes in contact with it. The law is that the tax on tobacco shall be paid before it is removed. Were it otherwise he might postpone it for years and never pay the tax at all. This is the point in this case. This man was removing and absolutely selling far more than he ever reported to the government. M. B. Brown had been a manufacturer in Cairo, Ill., and, though it did not appear distinctly, it seems there had been some difficulty, and a change of base became necessary. You do not find him here any more (referring to Mr. Brown not being present in court). He has retired early from this contest, and left Mr. Lightheuser to bear the brunt of the battle. (Subdued laughter). The gentlemen smiled, and could hardly restrain their laughter as the government opened, but as it has proceeded, a deep shade of melancholy has taken possession of their souls. Dr. Brown came from Cairo in September, and Powell commenced to operate in October. Where was Dr. Brown to be found? In W. H. Palmer's, on Olive street, which Mr. Lightheuser had defined the "common loafing place for the most respectable citizens in St. Louis." (More subdued laughter.) He was to be found more frequently there than at his office. He (Gen. Noble) had expected that M. B. Brown or E. B. Brown would have come upon the stand and testified. They could have been witnesses and testified in their own case. Why did they not do it? Why did they not come to strengthen their own case? Why did not M. B. Brown take the stand? He was afraid to do it. Why did not E. B. Brown come and prove where he bought Reid's tobacco. He knew that he could not do it, and that as big a lie has been told as was ever perpetrated in a court of justice. Why did he not come forward and tell you when he bought it; he was in this court while this trial was progressing. I subpenaed him so that they could not say he was away. Matteson, who was stated to have been governor of Illinois, had no right to go on Dr. Brown's bond. If he was a governor, what kind of a governor was he? It is well known in this Western country who "Governor" Matteson was. He took advantage of his official position to deprive that state of its revenue. He was not a resident in this district, and had no right to have his name on the bond. Have we no men in the state of Missouri who can go on a tobacco bond?

Gen. Noble continued his remarks, and argued that steps were taken to secure the appointment of Powell as inspector, and a conspiracy between him and Dr. Brown. He then gave a lengthy résumé of the accounts

to demonstrate that Brown had manufactured a great deal more tobacco than he had reported. He commented on the ever enlarging proportion of fraud, and the interest the community had in the case being tried. Dr. Brown did not keep the books required by law. Mr. Harding had said that Mr. E. B. Brown could not afford to have mercantile transactions in his own name; he was pension agent, and perhaps did not know that the bribe offered to an officer of the government would not be received; he expected the trial to be compromised; he was pension agent, and had influence. The speaker drew a picture of how the government can be cheated—a plan which, if carried out, would be successful; he said the plan would be to get a bar-keeper appointed an inspector, drink with him early and often, have him keep the records, get your friends to swear to your returns, have your bank in your pocket; if the factory is seized, let it be burned down, destroy the records, and collect the insurance money, if there is any; to have some one destroy the chief witness in the case, bribe the prosecuting witness and have your lawyer to betray the confidence of any witness that tried to come in. Well may the witnesses for the United States, like Mr. Dietrich, stand in awe and fear in the presence of the fate of Henry Christian. I do not say these men, this man, or either of these men, did it. But I say there was a happy collusion of circumstances in their favor throughout this cause. It was proved to you that the government had no interest in the destruction of the factory. He (Christian) may have been intemperate in his habits, and received a blow from some one with whom he may have quarreled. This case, he said, will purify the atmosphere; it is worth thousands of dollars to the United States, whether you give a verdict for the United States or not. It lets them understand there is some place where men are called to justice, and there is a community looking on hearing the words of the witnesses, and the result in the community is the same; those men are marked. He believed he recognized in the jury a purity of soul, an experience in life, that would enable them to give a just verdict, and he concluded with an earnest appeal to their sense of right and justice.

THE COURT instructed the jury, and reviewed the several counts in the informations. The first information, against the 905, narrows itself down to the investigation whether M. B. Brown made a true or a false return for the month of April. If it is true, that ends the matter so far as he is concerned. But if it is not true,—if he manufactured more than he reported in that return, or sold more than he reported,—they would find a verdict for the plaintiff. The second information referred to 272 caddies found in various mercantile houses about the city. It is charged with reference to this, that all of that tobacco was removed from M. B.

Brown's factory, with intent to defraud the United States of its tax. Of this, E. B. Brown claimed 100 caddies, on the ground that he is the owner of them, and had bought them in good faith. The enquiry divided itself. First, were the 172 caddies, M. B. Brown's, in his possession or under his control in the hands of these commission merchants, and if so were they there for the purpose of being sold with a view to defraud the government of its tax? And, so far as these 100 caddies, claimed by E. B. Brown, were they his or M. B. Brown's?

The jury retired, and came into court in about four hours. The foreman stated that one of them disagreed. A juryman said they wanted to know if they had to take into consideration criminal intent. Some thought that if a false return was made that was sufficient without reference to any criminal intent.

Gen. Noble beseeched the court to keep the jury until a verdict had been given. The verdict should be given. If they passed over Sunday, he was confident they would never get a verdict in the case. Now or never is the decision to be made, one side or the other, he did not care which.

THE COURT decided to allow the jury to separate, and said it would give fuller instructions on Monday. THE COURT trusted to their personal integrity not to converse with any one on the matter. THE COURT adjourned, and the jury scattered.

On Monday, a verdict for the United States, on all the articles of information, was rendered.